# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **PHILLIP L.,**[1]            ) | **No. 17 CV 8285** |
|         ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Magistrate Judge Young B. Kim** |
| ) | |
| **NANCY A. BERRYHILL, Acting** ) | |
| **Commissioner of Social Security,** ) | |
| ) | **March 14, 2019** |
| **Defendant.** ) | |

### MEMORANDUM OPINION and ORDER

Phillip L. ("Phillip") seeks disability insurance benefits ("DIB") based on his claim that he is disabled by a remote back fracture, Reflex Sympathetic Dystrophy ("RSD") in his feet, torn ligaments in both shoulders, chronic headaches, diabetes, and vision loss. After the Commissioner of Social Security denied his application, Phillip filed this lawsuit seeking judicial review. *See* 42 U.S.C. § 405(g). Before the court are the parties' cross-motions for summary judgment. For the following reasons, Phillip's motion is denied, and the government's is granted:

### Procedural History

Phillip filed his application for DIB in August 2014, alleging a disability onset date of October 1, 2010. (Administrative Record ("A.R.") 15, 261-311.) After his application was denied initially and upon reconsideration, (id. at 74-91, 123-32), Phillip sought and was granted a hearing before an administrative law judge

---

[1] Pursuant to Internal Operating Procedure 22, the court uses only the first name and last initial of Plaintiff in this opinion to protect his privacy to the extent possible.

("ALJ"), (id. at 209).  In December 2016 Phillip appeared for the hearing along with his attorney and a vocational expert ("VE").  (Id. at 41-73.)  The ALJ issued a decision in April 2017 finding that Phillip is not disabled.  (Id. at 12-40.)  When the Appeals Council declined Phillip's request for review, (id. at 1-6, 7-11), the ALJ's decision became the final decision of the Commissioner, *see Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015).  Phillip filed this lawsuit seeking judicial review of the Commissioner's decision, *see* 42 U.S.C. § 405(g), and the parties have consented to this court's jurisdiction, *see* 28 U.S.C. § 636(c); (R. 8).

## Background

Following a career as a landscaper, Phillip worked as a telephone line technician for almost 11 years before owning and operating a radio-controlled car race track from 2011 through 2014.  (A.R. 316-17.)  Phillip fractured his back in 2001, (id. at 24, 316), and asserts that the worsening pain in his back and feet prevents him from working on a full-time basis, (id. at 351).  During the December 2016 hearing, Phillip presented medical and testimonial evidence in support of his disability claim.

## A.    Medical Evidence

In February 2010 Phillip was examined because of his complaints of bilateral foot pain and burning sensation.  (A.R. 436.)  He reported that the pain started in August 2009 but had improved after a series of nerve blocks administered by Dr. Zaki Anwar, his treating pain management physician.  (Id.)  An MRI was ordered to evaluate Phillip's candidacy for a spinal cord stimulator ("SCS") implant.

(Id.)  A March 2010 MRI of Phillip's back showed "minimal degenerative disc disease without significant spinal stenosis."  (Id. at 469.)  A few weeks later an MRI of Phillip's thoracic spine showed "minimal spondylosis at T11-T12 [with] no significant spinal stenosis or acute findings seen."  (Id. at 441.)  Because of complaints of neck and shoulder pain on his right side, Phillip had an MRI of his cervical spine in July 2011, which revealed the alignment of the cervical spine, vertebral body heights, and prevertebral soft tissues were normal with no fractures or osseous lesions.  (Id. at 683.)  A May 2012 MRI of his thoracic spine showed normal alignment of curvature and no acute findings or significant spinal stenosis. (Id. at 679.)  A November 2013 MRI of his thoracic spine also showed no acute osseous abnormalities, focal disc herniations, central stenosis, or foraminal compromise.  (Id. at 676.)  A May 2014 MRI of his cervical spine revealed no signs of acute osseous abnormalities, focal disc herniations, central canal stenosis, or foraminal compromise.  (Id. at 673.)

In March 2012 Phillip visited Dr. Anwar with complaints of left elbow pain and reported relief with epicondyle injections.  (Id. at 690.)  Two months later Phillip reported rib pain, and a CT scan of his chest showed subtle focal irregularity of the left rib, suggesting a non-displaced acute fracture and a chronic appearing compression deformity.  (Id. at 681.)  In November 2012 Phillip reported pain in his right shoulder, and an MRI revealed superior labral tear from anterior to posterior ("SLAP") lesions.  (Id. at 678.)  An April 2014 MRI of the shoulder showed chronic mild rotator cuff tendinopathy that was less severe than what was shown on the

November 2012 MRI, no full-thickness tendon tear, and chronic SLAP lesions unchanged from the November 2012 MRI. (Id. at 1221-22.) In July 2014 Dr. Anwar completed a medical source statement in which he opined that Phillip could occasionally lift and carry six to ten pounds and frequently lift eleven to twenty pounds, stand for less than one hour, and sit for less than two hours in an eight-hour workday. (Id. at 626-27.) He further opined that Phillip could occasionally push and pull, climb, balance, reach, handle, and finger and feel, but could not climb, stoop, kneel, crouch, or crawl. (Id.)

In January 2016 Phillip began seeing Dr. Donald Roland because of a change in his medical insurance. (Id. at 1627.) Phillip complained of left low back pain for five years, feet pain for seven to eight years, and shoulder pain for two to three years. (Id.) Phillip's motor strength was 4/5, he had a negative straight leg raise, walked with a limp, had decreased range of motion, and was not able to perform a heel-toe walk. (Id. at 1629.) Phillip presented no acute distress, and had good range of motion of the neck and normal tone and bulk in the bilateral lower extremities. (Id. at 1629-30.) He had three lumbar epidural sympathic nerve blocks in 2016 and reported some relief. (Id. at 1591.) In July 2016 Phillip was referred for psychological evaluation for a trial SCS implant. (Id. at 1595.) Phillip's trial SCS was implanted in October 2016, (id. at 1587), and after a successful trial, a permanent SCS was implanted in March 2017 after the December 2016 hearing, (id. at 1644-45).

Throughout 2014 and 2015 Phillip had bilateral shoulder injections to treat his shoulder pain. (Id. at 1037-63.) In March 2016 Phillip was referred to Dr. Eric Varboncouer for bilateral shoulder pain. (Id. at 1212.) An April 2016 MRI of the left shoulder revealed supraspinatus and infraspinatus tendinopathy with no full thickness tear and bicep tendinopathy with posterior superior labral tear/degeneration. (Id. at 1220.) Dr. Varboncouer performed bilateral shoulder injections, and Phillip reported four or five weeks of relief after the injections. (Id. at 1212-13.) He also referred Phillip to physical therapy before considering shoulder surgery, (id. at 1183), but Phillip reported little improvement with his shoulders after about a month of physical therapy, (id. at 1568). In August 2016 Dr. Varboncouer performed arthroscopy with debridement surgery on Phillip's left shoulder, (id. at 1217-18), and Phillip then received more physical therapy, (id. at 1174, 1434).

Phillip began seeing Dr. Alexander Feokistov at Diamond Headache Clinic in June 2014 for his ongoing headaches. (Id. at 1298.) Phillip reported that he started having headaches when he was a child but stopped receiving treatment in the 1980s. (Id.) An MRI of the brain from July 2014 showed unremarkable findings. (Id. at 1238.) In August 2014 Phillip was admitted to the hospital for uncontrollable headaches, which were "unresponsive to outpatient treatment" and possibly caused by "interaction of the multiple medications." (Id. at 1244.) Phillip discussed with his physician's assistant the possibility of "weaning off opioids." (Id. at 766-67.) Phillip reported that he was diagnosed with Type 1 diabetes at age eight and had

been insulin dependent for more than ten years. (Id. at 805.) He declined a physical therapy evaluation and reported that he was independent with ambulation. (Id. at 809.)

In January 2015 Phillip completed a physical consultative exam with Dr. Sarat Yalamanchili. (Id. at 932.) Phillip reported pain in his shoulders and feet, an inability to lift heavy weights or walk long distances, and low back pain. (Id. at 937.) He had normal grip strength at 5/5 bilaterally and normal muscle strength with no atrophy. (Id. at 935.) Phillip's range of motion of his lumbar spine and hip joints and straight leg test were impaired because of pain. (Id. at 937.) He had a left side limping gait but did not require a cane during the gait examination. (Id. at 938.) In June 2015 state agency medical consultant Dr. Richard Bilinsky reviewed Phillip's medical record and opined that Phillip could lift 10 pounds occasionally and less than 10 pounds frequently, stand/walk for two hours, and sit for about six hours in an eight-hour workday. (Id. at 123.) He further opined that Phillip had limited ability to reach overhead and to push/pull with his lower extremities, could climb ramps/stairs but never ladders, ropes, or scaffolding, and could occasionally balance, stoop, kneel, crouch, and crawl. (Id. at 124.)

In August 2015 Phillip began seeing Dr. Simon Wu to manage his headaches and obesity. (Id. at 1162.) A month later Phillip reported improvement in the severity and frequency of his headaches. (Id. at 1156.) In November 2015 Phillip reported that his headaches were "not as severe and go away quicker." (Id. at 1148.) He was referred to a diabetes educational assessment in 2015 but was

discharged for not attending three sessions.  (Id. at 1504-05.)  Dr. Wu's treatment notes show that Phillip had normal strength in his upper and lower extremities with intact sensory, full range of motion without clubbing, cyanosis, and no tremor present.  (Id. at 949, 973, 979, 982, 986.)  Phillip was noted for overeating and occasional sugar variation because of non-compliance with his treatment protocol. (Id. at 980.)  Dr. Wu's treatment notes throughout 2016 reveal that Phillip's obesity was stable, that his diabetes was stable on insulin pump, and that his chronic back pain was stable while on narcotics for pain management, "allowing [Phillip] to have a functional daily life."  (Id. at 1127, 1131, 1134, 1137.)

## B.  Hearing Testimony

Phillip testified that he currently lives with his four children, wife, and parents.  (A.R. 46.)  He takes care of his children, with the help of his parents.  (Id.) When the ALJ asked Phillip to state the primary reasons he cannot work, he cited "extreme pain in [his] back" that "radiates down to [his] feet."  (Id. at 47.)  Phillip noted that he manages his pain with "rest and pain medication and when insurance cooperates, I get injections in my back."  (Id.)  He discontinued physical therapy because it was "exacerbating the situation."  (Id. at 48.)  Phillip explained that he takes Norco for pain, but although his doctors have suggested getting off opioids to relieve his headaches, he said that it was "not possible" until he is able to get an SCS implant. (Id. at 49.) Phillip also told the ALJ that he had been recently scheduled for a nerve block, which "take[s] some of the edge off," but it was canceled because his insurance denied the procedure.  (Id. at 49-50.)  He stated that he has

suffered from migraines since he was five years old, and gets them three to four times a month, (id. at 51, 62), but had not received specialized treatment since August 2014 because his insurance would not cover his visits, (id. at 51).

When the ALJ asked if he knew why his insurance would not cover his headache treatment, Phillip stated that "[i]t's half the insurance won't cover it, and half because there's always a remaining amount of money that is involved . . . I have to pay that balance off enough for them to continue seeing me. It's [] financial." (Id.) Phillip testifed that he switched to his wife's employer's insurance in October 2016. (Id.) The ALJ asked Phillip to clarify how his insurance issues impacted his ability to obtain more medical treatment, and Phillip answered that in regard to the nerve block, "it's just a matter of time. They generally get coverage, just going through the back and forth with the doctors," and he hopes it is "a similar course" with the SCS. (Id. at 52.) The ALJ then asked Phillip whether his shoulders were feeling better because he had not mentioned them as barriers to working. (Id.) Phillip told the ALJ that his shoulders had not improved, that he is continuing therapy on his left shoulder which has been worsening since his last post-operative assessment, and that he has not performed any work yet on his right shoulder. (Id.)

Phillip stated that he used to own a radio-controlled car race track for about three years before becoming unemployed. (Id. at 53.) He noted that although he had an income, he did not make any money. (Id.) He rented a building seven days a week but operated the track only on Fridays. (Id.) He closed the business because

it was not making money, the building was acquired by another owner, and his condition was worsening. (Id. at 55.) Phillip also worked as a telephone and network repairer for AT&T for almost 11 years. (Id. at 56.) He left AT&T because he started having problems with his back and feet and was suffering from migraines. (Id.) Prior to his job with AT&T, Phillip worked as a landscaper. (Id. at 58.)

When asked about his daily activities, Phillip stated that he usually helps his wife get their sons ready for school. (Id.) If he has physical therapy, he drives his sons to school, then himself to physical therapy. (Id.) Phillip then returns home and lies down, and if he is "feeling up to it," picks his children up from school. (Id.) He helps his sons with their homework after school and sits or lies down if necessary. (Id.) Phillip's mother usually prepares dinner and he and his wife watch television before going to bed. (Id. at 58-59.) Phillip helps his mother cook sometimes but does not do laundry because he has difficulty moving the laundry downstairs and because it causes pain in his shoulders. (Id. at 59.) He sometimes uses the internet to access Facebook, sell things on eBay, or look up things he finds interesting. (Id. at 60.)

During his testimony, Phillip's attorney noted that Phillip was sitting hunched over, resting on a cane. (Id. at 61.) Phillip explained that when he is at home he can recline on his couch, but he has difficulty sitting in chairs that do not support his shoulders or back. (Id.) When the ALJ asked about his cane use, Phillip admitted that it was not prescribed by a doctor and explained that he has

used the cane daily for the last year for "security" because of back and foot pain on his left side.  (Id. at 65.)  He said that he has the use of his fingers, but has trouble grasping even a half-gallon of milk.  (Id. at 62.)  He has trouble reaching because it causes pain in his shoulders, and he does not think that he could use his shoulders for two to three hours a day.  (Id. at 62-63.)  He also does not think that he could stand and walk more than two or three hours a day or walk more than a short distance.  (Id. at 63.)  When he experiences migraines, Phillip said that he is incapable of doing anything and must be in a dark room in bed with ice and medication.  (Id. at 62.)  He noted that Norco gives him headaches and keeps him awake at night, which sometimes causes him to have difficulty staying awake during the day.  (Id. at 63-64.)  Phillip said that he spends two hours a day lying down and sleeps a minimum of two hours a day.  (Id. at 64.)  He also stated that he has trouble concentrating and can only focus 75 percent of the time.  (Id.)

## C.    VE's Hearing Testimony

A VE testified at the hearing about the jobs available to someone with Phillip's limitations.  Based on the Dictionary of Occupational Titles ("DOT"), the VE determined that Phillip's past relevant work as a landscaper and as a telephone line technician would be classified as heavy work.  (A.R. 69.)  Phillip's work as a race track owner would be classified as light work.  (Id.)

The ALJ posed a series of hypothetical questions to the VE about an individual with the same age, education, and work experience as Phillip.  First, the ALJ asked about the jobs this individual could perform if he had a residual

functional capacity ("RFC") to perform sedentary work. (Id. at 70.) The ALJ further specified that this individual: could occasionally use his feet on foot controls; would be limited bilaterally from overhead reaching; could occasionally climb ramps and stairs but never ladders, ropes, or scaffolds; could occasionally balance, stoop, kneel, crouch, and crawl; should avoid all exposure to unprotected heights and moving mechanical parts; should have only occasional exposure to humidity and wetness; should avoid concentrated exposure to extreme cold or heat; and should only have moderate exposure to vibration. (Id.) The VE opined that such an individual would not be able to perform Phillip's past relevant work but could perform work as a sedentary assembler, order clerk, or surveillance video monitor. (Id.)

Phillip's attorney asked the VE whether the same individual who misses three or four days a month because of migraines would be able to perform any of the work she identified. (Id. at 71.) The VE responded that the person would not. (Id.) The attorney then asked whether the individual in the original hypothetical who would also be off task 25 percent of the time would be precluded from working. (Id.) The VE responded that the individual would not be able to work. (Id.) The attorney also asked whether the individual in the original hypothetical who could "never fully reach" in all directions would be precluded from working. (Id.) The VE responded that the individual could work as an order clerk or video surveillance monitor but not as a sedentary assembler. (Id.)

## The ALJ's Decision

The ALJ followed the required five-step process in evaluating Phillip's disability claims. *See* 20 C.F.R. § 404.1520(a). After determining that Phillip meets the insured status requirements of the Social Security Act, the ALJ found at step one that Phillip had engaged in substantial gainful activity in 2012 and again in 2014.[2] (A.R. 17.) At step two the ALJ concluded that Phillip had the following severe impairments: peripheral neuropathy; degenerative disc disease; disorder of the muscle, ligament, or fascia; diabetes; migraines; disorders of autonomic nervous system; and complex regional pain syndrome ("CRPS"). (Id. at 19.) At step three the ALJ determined that none of Phillip's impairments or combination of impairments meets or medically equals any listed impairment. (Id. at 23.) Before turning to step four, the ALJ assessed Phillip as having an RFC for sedentary work with several additional limitations. (Id. at 31.) At step four the ALJ concluded that Phillip was unable to perform his past work, but at step five, she found that Phillip could perform other work that exists in significant numbers in the national economy. (Id. at 32-33.)

## Analysis

Phillip argues that the ALJ erred by failing to adequately consider his subjective complaints and to support the RFC with substantial evidence. The court reviews the ALJ's decision only to ensure that it is supported by substantial

---

[2] The government concedes that the ALJ erred in finding that Phillip engaged in substantial gainful activity in 2012 and 2014 because the ALJ only considered Phillip's income without deducting his business expenses. However, because the ALJ completed the sequential analysis this error is harmless. *See Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013).

evidence, meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012) (internal quotation and citation omitted). To adequately support a decision, the ALJ must build "a logical bridge from the evidence to his conclusion" that the claimant is not disabled. *Id.* The court's role is neither to reweigh the evidence nor to substitute its judgment for the ALJ's. *See Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013).

## A. Symptom Evaluation

Phillip contends that the ALJ improperly evaluated his subjective symptoms. The ALJ's credibility determinations are entitled to special deference. *Sims v. Barnhart,* 442 F.3d 536, 538 (7th Cir. 2006) ("Credibility determinations can rarely be disturbed by a reviewing court, lacking as it does the opportunity to observe the claimant testifying."). The court will overturn an ALJ's decision to discredit a claimant's alleged symptoms only if the decision is "patently wrong," meaning it lacks explanation or support. *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014). A credibility determination lacks support when it relies on inferences that are not logically based on specific findings and evidence. *Id.*

As an initial note, the court rejects Phillip's suggestion that the government was required to meet a burden of production when discounting his symptom allegations. As the government points out, it is Phillip who bears the burden of production and persuasion at steps one through four. *See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes

such medical and other evidence of the existence thereof."); 20 C.F.R. § 404.1512(a) ("In general, you have to prove to us that you are . . . disabled."); *Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008) ("The claimant bears the burden of producing medical evidence that supports [his] claims of disability."). However, once the claimant shows an inability to perform past work, the burden shifts to the government to show that the claimant has the ability to engage in some other type of substantial gainful employment. *McNeil v. Califano*, 614 F.2d 142, 145 (7th Cir. 1980).

In challenging the ALJ's symptom evaluation, Phillip first asserts that the ALJ failed to mention certain objective medical evidence related to his leg and shoulders, including the implanting of SCS before February 2010 to treat CRPS and RSD in his leg and a nerve block in his left shoulder in December 2015. It has been firmly established that the ALJ "need not mention every piece of evidence, so long as she builds a logical bridge from the evidence to her conclusion," *see Pepper*, 712 F.3d at 362. A review of the ALJ's decision in this case reveals that she thoroughly discussed Phillip's shoulder treatments and even inquired into his alleged shoulder pain during the hearing without his prompting before assessing his bilateral shoulder limitations. (See A.R. 25-31, 52.) The ALJ also considered Phillip's reports of CRPS and RSD before limiting him to sedentary work. (See id. at 24, 26, 31.) Furthermore, the ALJ relied in part on the medical evidence to explain why she discredited Phillip's description of his disabling pain. Specifically, she noted that Phillip consistently presented for treatment as alert and oriented in no acute

distress, had no neurological deficits, had full range of motion in all four extremities, and had normal gait and strength. (Id. at 30 (citing id. at 822-903, 940-87, 1126-66, 1329-57, 1575-1631)).) The ALJ also considered Phillip's history of conservative treatment, (id. at 25), his reports of improvement and pain control with medications, (see id. at 29 (citing id. at 642)), and recent treatment notes showing that his chronic back pain was stable on narcotics, "allowing [Phillip] to have a functional daily life," (see id. at 29 (citing id. at 1127, 1131, 1134, 1137)). Thus, the court cannot say that the ALJ erred in considering the objective medical evidence in assessing Phillip's symptom allegations.

Phillip also argues that the ALJ improperly evaluated his daily activities. The Seventh Circuit has "criticized ALJs repeatedly for equating daily activities with an ability to engage in full-time work." *Schumaker v. Colvin*, 632 Fed. Appx. 861, 866 (7th Cir. 2015). But that is not what the ALJ did here. The ALJ in this case explained that Phillip reported that his life revolves around his children and that his daily activities include helping his wife get them ready for school, sometimes driving them to school on his way to physical therapy, and helping them with homework. (A.R. 30 (citing id. at 58).) She found that Phillip's "ability to drive . . . with his children in the car is contrary to his allegations of side effects" and that his ability to help his children with homework "supports focus and concentration." (Id. at 30.) The ALJ then explained that although Phillip testified that he cannot fold clothes or do laundry because of shoulder pain, both he and his wife reported that Phillip folds clothes twice weekly for at least 10 minutes. (See id. (citing id. at

373).)  She noted that Phillip sometimes uses the internet to access Facebook, sell things on eBay, and look up things that interest him, which demonstrates that Phillip "is busy engaging in other activities."  (See id. at 30 (citing id. at 60).)  The ALJ pointed out that Phillip reported that he goes to the airport to watch planes regularly, and that contrary to his allegations of limited ability to walk, Phillip was participating in walking exercises to help with weight loss.  (See id. at 30 (citing id. at 375, 1140).)  She also found that "[a]lthough [Phillip] alleged limited time spent weekly working with the radio-controlled cars, the ability to go weekly and on Fridays specifically is contrary to his allegations of significant daily pain with his pain dictating his activities."  (Id. at 29.)  After evaluating Phillip's daily activities, the ALJ concluded that "[o]verall, the record supports more activities than the claimant suggests."  (Id. at 30.)  There is a difference between an ALJ concluding that the claimant can work because he can perform a range of activities, *see Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013), and an ALJ holding that the claimant can do more than he claims because he performs this range of activities, *see Pepper*, 712 F.3d at 369.  In this case the ALJ did the latter.  Accordingly, this court cannot say that the ALJ's reasoning or conclusions were patently wrong.

Phillip further argues that the ALJ drew adverse inferences about his credibility based on his non-compliance with treatment without properly evaluating his explanation.  The Seventh Circuit has held that "[a]lthough a history of sporadic treatment or the failure to follow a treatment plan can undermine a claimant's credibility, an ALJ must first explore the claimant's reasons for the lack of medical

care before drawing a negative inference." *See Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012). Contrary to Phillip's assertion, the court finds that the ALJ properly evaluated Phillip's explanations regarding his noncompliance and delay in seeking treatment before drawing adverse inferences against him. During the hearing, Phillip cited difficulty with his insurance as a reason for his delay in seeking treatment, and the ALJ asked follow-up questions to explore that testimony. (A.R. 51.) In her decision, the ALJ discussed Phillip's choice to forego physical therapy to address his persistent back pain and his delay in seeking treatment. (Id. at 24, 28.) She noted that although Phillip had been discussing an SCS trial as far back as 2010, (see id. at 28 (citing id. at 438, 1052), he had only recently received a permanent SCS implant, (see id. at 28 (citing id. at 1644-45)). The ALJ also found the lack of any ongoing specialized treatment to address Phillip's long history of migraine headaches until 2014 inconsistent with his complaints of "daily headaches and debilitating headaches." (Id. at 26.) The ALJ further found that "[t]he record does not support any indication that there were insurance or other problems," (id. at 31), and reasonably concluded that Phillip's "non-compliance with treatment . . . suggests the symptoms he alleges are not as severe as alleged because he is not motivated to follow prescribed treatment," (id. at 28). Because the ALJ adequately inquired into and considered Phillip's reason for his delay in medical treatment, the court finds no reason to disturb the ALJ's determination.

Lastly, at least with respect to the symptom evaluation, Phillip argues that the ALJ mischaracterized the record when she wrote in her decision that Phillip "made a reference in his post hearing brief that [he] spent the hearing on a chair hunched forward with both hands on the handle of a cane. However, this observation and presentation is not supported anywhere in the record." (See id. at 29 (internal citation omitted).) Phillip asserts that the ALJ disregarded his testimony that he was only sitting hunched over and resting on a cane because his chair did not provide support for his shoulders or back. (See id. at 61.) Regardless of Phillip's explanation, it is clear that the ALJ did not find his hearing presentation to be credible and supported her determination with evidence from the record. Specifically, the ALJ referenced exam findings noting Phillip's "normal and erect gait, which is contrary to this observation at hearing." (See id. at 29 (citing id. at 723).) She also explained that the record did not support Phillip's cane use and pointed out that just a month before the hearing he was reported not to have an assistive device. (See id. (citing id. at 1580).) As the government points out, the only evidence that Phillip identifies to support his hearing presentation is a self-serving statement he made during the hearing. Accordingly, the court finds no reason to disturb the ALJ's decision where her determinations are substantially supported by the record. *See Carradine v. Barnhart*, 360 F.3d 751, 777 (7th Cir. 2004) ("Since the ALJ is in the best position to observe witnesses, this Court will not upset credibility determinations on appeal so long as they find some support in the record and are not patently wrong." (internal quotations and emphasis omitted)).

## B.    RFC Assessment

Phillip next asserts that the ALJ erred in determining his RFC.  He alleges that the ALJ did not properly weigh the opinion of Dr. Anwar, his treating pain specialist.  Under the treating physician rule, the ALJ must give controlling weight to a treating physician's opinion if it is well supported by medically acceptable diagnostic techniques and it is not inconsistent with other substantial evidence of record.[3]  *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008).  If the ALJ concludes that a treating physician's opinion is not entitled to controlling weight, she must give good reasons for discounting the opinion, after considering the following factors:

> (1) whether the physician examined the claimant, (2) whether the physician treated the claimant, and if so, the duration of overall treatment and the thoroughness and frequency of examinations, (3) whether other medical evidence supports the physician's opinion, (4) whether the physician's opinion is consistent with the record, and (5) whether the opinion relates to the physician's specialty.

*Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016); *see also* 20 C.F.R. § 404.1527(c).  As long as the ALJ articulates her reasons, she "may discount a treating physician's medical opinion if it is inconsistent" with the opinion of a consulting physician.  *See Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004).

Here the ALJ rejected Dr. Anwar's opinion because she found it both internally inconsistent and inconsistent with the record evidence.  *See Knight v.*

---

[3]    The SSA recently adopted new rules for agency review of disability claims involving the treating physician rule.  *See* 82 Fed. Reg. 5844-01, 2017 WL 168819, at *5844 (Jan. 18, 2017).  Because these new rules apply only to disability applications filed on or after March 27, 2017, they are not applicable here.  *See id.*

*Chater*, 55 F.3d 309, 314 (7th Cir. 1995) ("Medical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence." (internal citations omitted)). First, the ALJ explained that the weight limitations included in Dr. Anwar's opinion were "inconsistent on the face of the document." (A.R. 30.) Specifically, the ALJ noted that Dr. Anwar unreasonably opined that Phillip could *occasionally* lift and carry six to ten pounds, but could *frequently* lift and carry eleven to twenty pounds. (See id. (citing id. at 626).) The ALJ also found that Dr. Anwar's assessed limitations were inconsistent with Phillip's activities of caring for his four children, operating a business, and the prolonged delay in obtaining an SCS implant, especially given that other than Phillip's testimony the record is devoid of any insurance coverage issues. (Id. at 31.)

The ALJ further explained that Dr. Anwar "did not provide any specific objective findings to support this medical opinion." (Id. at 30.) For instance, the ALJ pointed out that when asked to provide clinical or laboratory findings to support his assessed limitations, Dr. Anwar simply wrote "compression fracture." (See id. (citing id. at 627).) The ALJ noted, however, that Phillip had sustained the fracture years before and after that injury he continued to work a job with a much greater exertional level than provided in the assessed RFC. (Id. at 30-31.) In addition, the ALJ found "the medical opinion of checking off boxes without any elaboration is inconsistent with the overall record and the claimant's work and other activities." (Id. at 30.) The court thus finds it was "reasonab[e]" for the ALJ to "demand . . . from [a treating physician] some explanation for finding limitations

so . . . severe." *See McFadden v. Berryhill*, 721 Fed. Appx. 501, 505, (7th Cir. 2018); *see also* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion . . . the more weight we will give that opinion.").

Phillip also contends that the ALJ failed to properly analyze Dr. Anwar's opinion because she did not specifically address each factor set forth in 20 C.F.R. § 404.1527. While the ALJ in this case did not explicitly weigh each factor in discussing Dr. Anwar's opinion, her decision makes clear that she was aware of and considered many of the factors, including Dr. Anwar's treatment relationship with Phillip, the consistency of his opinion with the record as a whole, the supportability of his opinion, and his specialty in pain management. (A.R. 25, 30-31.) The court may not necessarily agree with the weight the ALJ afforded to Dr. Anwar's opinion, but its inquiry is limited to whether the ALJ sufficiently accounted for the § 404.1527 factors, *see Elder v. Astrue,* 529 F.3d 408, 415-16 (7th Cir. 2008) (affirming denial of benefits where ALJ discussed only two of the relevant § 404.1527 factors), and built an "accurate and logical bridge" between the evidence and his conclusion.

Moreover, the ALJ properly relied on state medical consultant Dr. Bilinsky's opinion that Phillip was capable of performing sedentary work. (A.R. 31 (citing id. at 126).) The ALJ explained that she gave Dr. Bilinsky's opinion "great weight" because it was "consistent with the objective medical and other evidence of record and the course of treatment for his documented complaints." (Id. at 31.) Phillip essentially contends that the ALJ should have weighed the evidence differently

than she did, but it is not this court's role to reweigh the evidence or substitute its judgment for the ALJ's with respect to how the conflicting medical opinions should be balanced. *See Pepper*, 712 F.3d at 362. Accordingly, the court finds no basis for remand in the ALJ's analysis of the medical opinions submitted in this case.

Phillip next asserts that although the ALJ found CRPS to be a severe impairment, she did not adequately consider how it impacted his attention and concentration, cognition, mood, behavior, and motor reactions time. More specifically, according to Phillip, the ALJ failed to consider his testimony that he could concentrate only 75 percent of the time. The court finds no merit to this argument. In assessing Phillip's concentration and ability to maintain persistence or pace, the ALJ explained that although Phillip testified that he had difficulty concentrating and focusing, in his function report he stated that he had no trouble with paying attention, handling changes in routine, handling stress, and following written and spoken instructions. (A.R. 22 (citing id. at 332-33).) The ALJ also pointed to Phillip's ability to drive and his ability to manage his own business as further support that Phillip has no problems with concentration, focus, and maintaining pace. (Id. at 22.) In addition, the ALJ noted that Phillip's mental status examinations were normal across different treating sources, consistently noting that he was "alert and oriented" and that Phillip's most recent exam revealed "normal attention and concentration span." (See id. (citing id. at 718, 724, 778, 828-41, 1128, 1212, 1301, 1347, 1630).) She further noted that Phillip's physical consultative exam showed that he was alert, awake, and oriented with his

immediate, remote, and recent memory intact. (See id. at 22 (citing id. at 937).) A commonsensical reading of the ALJ's decision suggests that she did not find Phillip's statement regarding his ability to concentrate to be credible and did not believe the record supported additional limitations in that functional area. *See Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000) ("In analyzing an ALJ's opinion for such fatal gaps or contradictions, 'we give the opinion a commonsensical reading rather than nitpicking at it.'" (quoting *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999))). Moreover, Phillip does not point to any evidence in the record supporting any additional limitations resulting from his CRPS. Therefore, even if the ALJ had erred in considering how Phillip's CRPS impacts his ability to work, that error would be harmless. *See Schomas*, 732 F.3d at 707 (explaining that the court "will not remand a case to the ALJ for further explanation if we can predict with great confidence that the result on remand would be the same"). Accordingly, the court finds that the ALJ properly assessed the impact Phillip's impairments had on his his cognitive ability, including his ability to concentrate.

Finally, Phillip argues that the ALJ should have ordered an updated medical expert opinion of medical equivalency, as requested in his pre-hearing memorandum, (A.R. 410), because the new evidence since the last state agency review significantly changed the picture. Specifically, Phillip argues that the ALJ failed to consider that he had received a left shoulder block in December 2015, had reduced strength and range of motion in his shoulders in June and September 2016, and still had reduced range of motion and strength in his shoulders at physical

therapy just after the SCS implant in October 2016. Social Security Ruling 96-6p requires that "[w]hen additional medical evidence is received that in the opinion of the [ALJ] . . . may change the State agency medical . . . consultant's finding that the claimant's impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments," the ALJ must call on a medical expert. SSR 96-6p, 1996 WL 374180, at *4; *A.H. ex rel. Williams v. Astrue*, No. 09 CV 6981, 2011 WL 1935830, at *18 (N.D. Ill. May 18, 2011). In this case, however, Phillip has not explained how the findings on those reports dated after Dr. Bilinsky's June 2015 report would have changed the expert's undisputed opinion regarding Phillip's postural limitations or ability to perform work at a sedentary level. *See Keys v. Berryhill*, No. 16 CV 1745, 2017 WL 548989, at *3 (7th Cir. Feb. 9, 2017) ("It is true that [the state agency doctors] did not review these later reports, but [the claimant] has not provided any evidence that the reports would have changed the doctors' opinions. If an ALJ were required to update the record any time a claimant continued to receive treatment, a case might never end."); *Steward v. Bowen*, 858 F.2d 1295, 1299 (7th Cir. 1988) ("Although the ALJ could have requested an updated opinion from a medical [expert] on the question of medical equivalency . . . we cannot say that the uncontradicted evidence in the record required him to do so."). Accordingly, Phillip's argument that the ALJ erred by failing to obtain an updated medical opinion concerning medical equivalency is unpersuasive.

## Conclusion

For the foregoing reasons, Phillip's motion for summary judgment is denied, the government's is granted, and the ALJ's decision is affirmed.

**ENTER:**

_____
**Young B. Kim**